# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>ROBERT P. TODISCO,<br><br>            Debtor<br>————————————<br>CHARLES KINSELLA,<br><br>            Plaintiff<br><br>v.<br><br>ROBERT P. TODISCO,<br><br>            Defendant | **Chapter 7**<br>**Case No. 07-15153-FJB**<br><br><br><br><br>**Adversary Proceeding**<br>**No. 07-1418** |

## <u>MEMORANDUM OF DECISION</u>

By his complaint in this adversary proceeding, Charles Kinsella seeks a determination that his tort claims against the defendant and debtor, Robert P. Todisco, for Todisco's loss and misappropriation of monies that Kinsella alleges he entrusted to Todisco for management and investment are excepted from discharge under 11 U.S.C. § 523(a)(4) and (6).  Kinsella argues that Todisco's liability on these claims, which are as yet unliquidated, is, in whole or in part, a debt for fraud while acting in a fiduciary capacity, for embezzlement, for larceny, or for willful and malicious injury.  After a trial and for the reasons set forth below, the Court concludes that Kinsella has failed to carry his burden and that judgment must enter for Todisco as to each count.

**PROCEDURAL HISTORY**

Todisco filed a petition for relief under chapter 7 of the Bankruptcy Code on August 15, 2007, thereby commencing the present bankruptcy case, and has received a discharge in the case.  Before he

received a discharge, however, Kinsella timely filed the complaint commencing this adversary

proceeding.  The complaint asserts two counts.  The first, under § 523(a)(4), alleges that Todisco, by

converting monies that Kinsella had entrusted to him, breached a fiduciary duty he owed to Kinsella,

which duty arose from representations Todisco made to him regarding his investment ability and

guarantee of a 12 percent annual return.  On the basis of this breach of fiduciary duty, Kinsella demands

in this count a judgment of liability in the amount of $620,000, representing the funds entrusted and

reasonable interest thereon, and a determination that this liability is excepted from discharge.  In the

second count, Kinsella seeks a determination that Todisco's conversion of his funds was a willful and

malicious injury, the liability for which is excepted from discharge by § 523(a)(6).[1]  Todisco answered by

denying the factual allegations of the complaint.  He alleges both (i) that the funds in question were his

own because Kinsella had given them to him as a gift and (ii) that Kinsella was largely responsible for the

loss of the funds by virtue of his uncontrolled spending with credit cards.


**FINDINGS OF FACT**

       **a.**      <u>**The Personal Relationship**</u>

       Charles Kinsella, who at the time of trial was 68 years of age, was born in 1940.  In his twenties,

he was ordained as a priest in the Roman Catholic Church, initially as a member of a religious order.

Within a few years of ordination, he left the order and became a diocesan priest.  In that capacity he

was assigned to a parish in which, in 1969, he baptized Todisco as an infant.  With that baptism, he

began a lifelong friendship with the Todisco family, at whose home he was a frequent guest.  He

presided at all of the major religious events in the life of the family—baptisms, weddings, funerals—and

---

[1] The complaint includes demands for adjudication of the underlying liability and for punitive damages.  As to both
Kinsella's claims for adjudication of liability and certain counterclaims, the Court, upon earlier process, entered an
order of abstention under 28 U.S.C. § 1334(c)(1), thus limiting this adversary proceeding to Kinsella's counts for
determination of dischargeability.

his relationship with the family remained strong even after, a few years later, he was transferred to

another parish.

In time he became especially good friends with Todisco himself.  From about the age of nine,

Todisco spent a great deal of time with Kinsella.  Todisco remembers many Friday night outings for pizza

and movies.  Kinsella figured large in Todisco's summers.  They made numerous trips together to

amusement parks, seeking out roller coasters.  During his teens, Todisco's relationship with Kinsella

continued.  They traveled together, including with others, on numerous occasions, often to amusement

parks up and down the East Coast, and once on an extended vacation to Europe.  In general, they spent

a great deal of time together and had a warm and trusting relationship.  Todisco testified that Kinsella

had been like a father to him.

Todisco was also often a guest, including for numerous overnight visits, at the home of Kinsella's

mother, Emily Kinsella.  His relationship with Emily Kinsella, whom he called Auntie, was affectionate

and such that she eventually named him in her will as the first alternate beneficiary, after Kinsella

himself.  Todisco's relationship with Kinsella and his mother was like that of family.

The close relationship between Kinsella and Todisco continued into Todisco's adulthood and

became mutually supportive.  Todisco eventually married and had children.  Kinsella presided at

Todisco's wedding, baptized his children, and was often a guest at his home.  Todisco regarded Kinsella

as his best friend, and Kinsella came to rely upon Todisco for help, support, and advice in many matters.


b.     **The Financial Relationship**

 Not least among these were matters of personal finance.  In college, Todisco had studied

marketing and had developed a passion for finance and investing.  In 1994, he graduated from college

and obtained federal and state licenses as a broker and investment adviser, which licenses he held until

he gave them up in 2002.  He initially went to work for the brokerage firm of Dean Witter.  Then in 1997,

3

he and a partner formed a financial consulting corporation known as R&B Financial Solutions.  This corporation went out of business in 2002 or 2003.  In 2002, Todisco gave up his licenses and opened his own consulting firm, known as RT Consulting.  He was glad to use his talents in investment and in basic personal financial management to help Kinsella.

When Kinsella's mother died in late 1995, Todisco, at Kinsella's request, went to live with Kinsella for several months, as a support during Kinsella's time of bereavement and adjustment.  It was during this time that Kinsella began to rely on Todisco for help in matters financial.  Kinsella inherited his mother's estate, which consisted of cash in bank accounts of approximately $110,000 and his mother's home.  Before this inheritance, Kinsella's only asset of any significance was a deferred compensation account, the accumulated value of which, as of 1995, is not in evidence.[2]  Aside from this account, he had no wealth of his own.  More importantly, he had no sophistication, indeed very little competence at all, in matters of personal financial management.  He apparently could not manage even a checking account, and he had repeatedly gotten into trouble incurring more credit card debt than he could afford.  Until his mother's death, he had been quite dependent on her for help with his finances.  She had on multiple occasions bailed him out of significant problems with credit card debt.  With the death of his mother, he lost his principal financial assistant and benefactor.  Now Kinsella had money of his own, but also persistent credit card debt and an awareness that he should be planning for his retirement—he was 55 when his mother died—and no sense of how to address these issues.  Todisco

---

[2] Many details of the relevant financial history are either very sketchy or not in evidence at all.  Only two witnesses testified who had direct knowledge of the financial history:  Kinsella and Todisco.  By his own admission and extensive demonstration in his testimony, Kinsella's memory for financial details was poor.  The utility of his testimony was further weakened by his utter lack of facility with and understanding of personal finance.  He was easily flustered and confused.  His case might have been strengthened by submission of the records of the various checking, banking, credit card, and brokerage accounts that are part of this story, but very few of these were submitted.  He alleged that Todisco had destroyed records, but this is a mischaracterization of Todisco's testimony:  Todisco had, as a matter of practice, discarded paper records of which electronic versions were available on line.  There is no evidence that he destroyed records or that the relevant records could not have been obtained by subpoena or otherwise from the financial institutions concerned.  Kinsella does not appear to have obtained these documents and, except with respect to a relatively few records of the parties' joint checking account, certainly did not offer them into evidence.

offered him advice and help.  Kinsella was only too happy to place virtually all of the responsibility for the management of his financial affairs into Todisco's hands.

Around this time, Todisco advised Kinsella not simply to place the cash portion of his inheritance in a bank account but instead to allow Todisco to invest or manage it for him.  Kinsella testified that Todisco told him that he could achieve for Kinsella a 12 percent annual return on principal and have the credit card debt paid down within five years.  Todisco denies that he promised or guaranteed Kinsella a 12 percent annual return.  No agreement or arrangement between the parties was ever reduced to writing.  However, Kinsella further testified, credibly, that at some later point, Todisco told Kinsella that 12 percent was too ambitious and couldn't be done or maintained.  Kinsella responded by telling Todisco that if he couldn't get him 12 percent, then he wanted his money back.  In response, Kinsella says, Todisco agreed to continue their financial relationship on the understanding that Todisco would guarantee to Kinsella a 12 percent annual return, essentially an annuity.  I find this testimony credible because there is evidence that, at least during a portion of the period in which Todisco was managing Kinsella's funds, Todisco did in fact make monthly payments to Kinsella at an annualized rate approximately equal to this rate of return:  $1100 a month after the initial "investment" of $110,000; and $3,500 per month after the investment of an additional $251,000 from the proceeds of the house.

Kinsella eventually did turn his inheritance and other funds over to Todisco for investment and management.  He did so for two reasons:  first, because Todisco had told him that he could achieve an annual return of 12 percent, which Kinsella understood was a significantly better return than a simple bank account would produce; and second, because Kinsella was eager to be freed of responsibility for his own financial affairs.  He found in Todisco a trusted friend who was competent and knowledgeable in matters of personal finance and willing and happy to take over that responsibility.  He believed Todisco could and would solve his financial problems.

Kinsella turned over his monies to Todisco in three tranches:  first, approximately $110,000[3] that

he inherited from his mother; second, in January 2003, proceeds of $16,551.89 from the deferred

compensation account; and third, in March 2003, proceeds of $251,142.98 from the sale of his mother's

house.  The parties offered little evidence of discussions between them as to the manner in which

Todisco was to hold and manage these funds for Kinsella.  It is not clear that there were any such

discussions, much less an agreement.  In view of Kinsella's lack of understanding of financial matters and

the close relationship between the parties, it is probable that the parties never achieved conceptual

clarity about many aspects of the relationship they were beginning to establish and did establish.  They

had no written agreement.  There is no evidence that they sought the advice of an attorney or other

professional or adviser as to the structuring of their relationship.  They did not establish a trust, and

there is no evidence that they ever intended to or discussed the possibility of establishing a trust.

Kinsella testified that, at some unspecified time, Todisco had said he would memorialize their financial

relationship by giving Kinsella a promissory note, but Todisco never did give Kinsella a promissory note.

If the parties had any discussion regarding a possible promissory note, its substance is not in evidence.

Nor did Kinsella explain—if he knew, and I doubt that he did—or otherwise introduce evidence of the

purpose this promissory note might have served, its terms, or the role it would or might have played in

structuring their relationship.

While little is clear about the nature of the parties' financial relationship, such evidence as does

exist preponderates in favor of the following conclusions.  First, no express trust relationship was

established or intended.  There is simply no evidence that a trust was ever even discussed, either in

form or in substance.

Second, Kinsella attached little importance to the manner in which Todisco held his money.  It

does not appear to have been important to him that Todisco maintain his (Kinsella's) funds separate

---

[3] Transcript, vol. 3, p. 7.  The precise date of this turnover is unclear:  probably in 1996 or 1997, but Kinsella
conceded that it may have been as late as 2001.

from Todisco's own funds.  He trusted Todisco to achieve for him his financial goals—an annual return of 12 percent and control of the credit card debt—but cared and understood little about how Todisco accomplished these goals.  He did not think of Todisco as a hired trustee or investor from whom he might expect a professional degree of accountability.  Kinsella testified that he expected no accounting and simply trusted Todisco to do the right thing.  To Kinsella, Todisco was more like a substitute parent—he took the place of Kinsella's mother—who would provide for him and relieve him of the need to worry about these matters.  In essence Kinsella made himself a dependent of Todisco and simply trusted that somehow Todisco would provide for him.  He would no more think to restrict the manner in which Todisco could use the funds than he would to tell his mother how to provide for him.

Third, what was important to Kinsella was that Todisco pay to him, on a monthly basis, a dividend at an annualized rate of return of twelve percent and tame his credit card debt.  Todisco understood this and in fact appears to have tried mightily to carry out these objectives even after both Kinsella's money and his own had been almost entirely lost or depleted.  In effect, their arrangement was that Kinsella would turn over to Todisco his funds, and, with these resources, Todisco would somehow assure to him in perpetuity a monthly annuity payment on which Kinsella would live in his retirement.  Todisco's obligation, as both parties appear to have understood it, was not so much to preserve and maximize the return on Kinsella's funds as it was to provide to Kinsella an annuity.  It was a matter of providing the annuity and using Kinsella's funds as a tool to that end.  How he used the tool was largely left to Todisco's discretion.

Fourth, the parties appear to have mutually understood that this arrangement between them would continue for the duration of Kinsella's life.  At a meeting with Attorney Edward Surette in January 2003, Surette asked Todisco, in Kinsella's presence, how long he would pay interest to Kinsella on the funds he had turned over to him for investment.  Todisco answered, "for life."[4]

---

[4] Transcript, vol. 3, p. 12.

Fifth, because the arrangement would continue for life, Kinsella had no expectation of ever receiving his funds back again, except insofar as they produced to him his twelve percent annual return. There existed no term at which Todisco would have to return to him his "principal" and any accumulated "interest" over and above the 12 percent dividend that Todisco was to pay him annually.

Sixth, Kinsella intended to and did give the funds in question to Todisco for the benefit of himself and his children, but without relieving Todisco of his agreement to continue providing the monthly annuity for life. Todisco himself testified credibly that Kinsella had on three occasions expressly made a gift of funds to Todisco for him and his children. This occurred first with a gift of $40,000 after the birth of his twins in 2000, a second time with a gift of $60,000 after the birth of his third child in 2003, and a third time upon the sale of the Methuen house in 2003, when he made a gift of the entire sale proceeds.[5]  (Transcript, vol. 1, p. 87; vol. 2, pp. 191, 195, 205, 220-222)  Todisco also testified, again credibly, to other statements by Kinsella that were consistent with his understanding that Kinsella intended for the invested funds to be Todisco's.  Specifically, Todisco testified that when he advised Kinsella to use the turned-over funds to pay all his monstrous credit card debt, Kinsella's response was, "No this is money for you and your children."  (Transcript, vol. 2, pp. 156, 195-196)  Todisco also testified that when Kinsella purchased a house in Florida in 2003, Todisco advised him to pay for the house in cash, and again Kinsella responded:  "No.  The money is for you and your children." (Transcript, vol. 2, p. 180)

Kinsella denied at trial that he had ever made a gift of these funds to Todisco, but in other testimony he contradicted these denials.  He testified that their understanding was that Todisco "would take care of my investments and give me the interest that I would live on, and that he [Todisco] *would*

---

[5] Todisco filed no gift tax return as to these gifts, but the obligation to file a gift tax return is on the donor, not the donee, and, in any event, neither Todisco nor Kinsella was aware of this obligation.  On a related issue:  Kinsella's federal and Massachusetts income tax returns for 2002, 2003, and 2004  do not report his annuity payments as income even though, according to Kinsella, he has consistently believed that those payments were his interest income.  I make nothing of the inconsistency because Kinsella did not prepare his tax returns and surely did not understand them or his reporting requirements.

*get the rest of the money*."  (Transcript, vol. 2, p. 235.)  He also testified that, after the sale of the

Methuen home, Todisco had told him "that he had invested it [the proceeds of the sale] in a long-term

insurance—a long term thing *for him and his children*."  (Transcript, vol. 2, p. 239)  It is clear from

Kinsella's testimony on this point that he found nothing objectionable in the news that Todisco had

invested the monies "for him [Todisco] and his children."

For these reasons, I find, as Todisco maintains, that Kinsella gave virtually all the funds at issue

to Kinsella as a gift.  Still, this finding requires a qualification.  Notwithstanding his clear gift of the funds

to Todisco, he remained quite dependent on Todisco and did not, by these gifts, relieve Todisco of the

obligation to continue providing the 12% annuity on which he was relying.  In effect, he made a gift of

the principal but nonetheless expected Todisco to use it to generate the annuity.  And Todisco

understood this.

Seventh, Todisco appears to have undertaken to provide this service to Kinsella for no

compensation.  In the early going, 1997, Todisco received a commission of $100 for one transaction he

handled for Kinsella, but this was not repeated.  They had no agreement for compensation.  Nor was

compensation paid.  Neither party conceived of their relationship as commercial in nature.  Todisco

performed his services gratis.  Nor was Kinsella's transfer of his assets to Todisco, by will or by gift, an

act of compensation, certainly not a bargained for or agreed compensation.  To be sure, it was in part

motivated by gratitude for Todisco's assistance, but it too was essentially a gift, motivated at root by

affection.

c.      **Kinsella Arranges for Todisco to Have Control and Receive Records**

Over time and in a series of steps between 1995 and 2003, Kinsella arranged for Todisco to be

the recipient and keeper of most of his financial mail and records, to have a general power of attorney

over his financial affairs, to be the holder, owner, and manager of most of his funds, to be the payer of

his bills, and to have signatory authority over his primary checking account.  The precise dates of most of these events are not in evidence.

At least as early as December 2002 and probably earlier,[6] Kinsella gave Todisco signatory authority over his primary checking account, an account at Fleet Bank; in the latter months of 2004 and by virtue of Fleet's merger into Bank of America, this became a Bank of America account.  This was a joint account.  It was into this account that Todisco made his monthly deposit of the annuity payment. Todisco also used the account to pay Kinsella's bills.  Kinsella made ATM and debit card withdrawals from the account and also sometimes transferred monies from this account into a separate personal checking account that he maintained at Big Lake National Bank in Florida.  Todisco had no authority over the Big Lake account; Kinsella alone used it, mostly for debit card payments.  Kinsella also had a separate personal checking account at Merrimack Valley Federal Credit Union, in North Andover, Massachusetts; again Todisco, had no authority over this account.  As to all three accounts, Kinsella arranged for the monthly statements to be sent to Todisco, either by changing the mailing address on the account to Todisco's or by postal forwarding.

At some time not in evidence, but probably no earlier than the year 2000, Kinsella also arranged for his credit card bills and perhaps other bills as well to be sent to Todisco's address.  He asked Todisco to manage and handle payments on his credit card accounts, and Todisco agreed to do so and did handle these matters for Kinsella until September 2005.  Todisco handled most if not all of Kinsella's bill-paying obligations.  In some cases, such as with the monthly payments due on Kinsella's auto loan, he did this by arranging for monthly automatic withdrawals from the joint account.

In August 2000, Kinsella retained an attorney, Edward Surette, for assistance in giving Todisco a general and durable power of attorney.  Todisco introduced Kinsella to Surette for this purpose, and together they went to Surette's office on or around August 21, 2000 for Kinsella to execute the

---

[6] The date on which this account was made a joint account is not in evidence.  The earliest records of this account that are in evidence reflect transactions for the 32-day period commencing December 7, 2002.

document evidencing the grant of the power of attorney.  Surette did prepare a general and durable

power of attorney from Kinsella to Todisco, and Kinsella executed the document on August 21, 2000.

According to representations made by Kinsella to Surette at the time, the purpose of this power of

attorney was to enable Todisco to help Kinsella with his finances when Kinsella "wasn't local."[7]  The

document memorializing the general power of attorney neither purported to nor did govern the terms

on which Todisco was to hold or manage monies for Kinsella.  Kinsella did not ask Surette for advice or

help on the issue.


### d.      The Deferred Compensation Account

From 1982 to 1992, Kinsella was employed by the Commonwealth of Massachusetts as a

chaplain at Cushing Hospital in Framingham.  During this time, a portion of his earnings was withheld

from each paycheck and placed into a deferred compensation account.  In 1994 or 1995, after Kinsella

left the Commonwealth's employ and while Todisco was employed at Dean Witter, Kinsella told him that

he wanted to withdraw the funds from this deferred compensation account.  Todisco placed him in

touch with a broker at Dean Witter who handled this for Kinsella.  (Transcript, vol. 1, pp. 100-102)

Kinsella invested the money through Dean Witter, where it remained after Todisco left the brokerage's

employ (he was there for only six months); Todisco appears to have had no role in the handling of the

account at Dean Witter.  In September 1997, relying in part on advice given him by Todisco, Kinsella

elected to remove the funds from Dean Witter and invest them in an Individual Retirement Account

through AIM Fund Services.  (Transcript, vol. 1, p. 103)  The specific investments that Kinsella made

through AIM appear to have been chosen by Kinsella with advice from Todisco.[8]  The deferred

compensation funds remained so invested until January, 2003.  On or about January 10, 2003, Kinsella

---

[7]  In the year 2000, Kinsella began spending a portion of each year in Florida.  In late 2002 or early 2003, he
purchased a home there.  (Transcript, vol. 1, p. 108)  The precise dates are not in evidence.
[8]  Kinsella does not allege that Todisco's limited roles in the placement of the funds at Dean Witter and AIM Fund
Services was in any sense wrongful or harmful.

elected to and did close out his AIM investment account.  At Kinsella's direction, the check for the

proceeds, which totaled $16,551.89, was delivered to Todisco.  Todisco endorsed the check and, on

February 6, 2003, deposited it into his and Kinsella's joint account.  (Transcript, vol. 1, pp. 102-121; vol.

2, pp. 138-139, 141; Plaintiff's Exhibits 6,  8, and 13 (at Bates #368))   This deposit raised the balance in

the joint account to $21,503.14.  That same day, he wrote a check on the same account to himself in the

amount of $20,000, reducing the balance in the account to $1,803.14.  (Plaintiff's Exhibits 7 and 13 (at

Bates  #368 and #380))  It's fair to conclude that, by the $20,000 check, Todisco essentially removed the

proceeds of the deferred compensation account from the joint account into his own control.  How he

used these specific funds is not in evidence, but there is no evidence to suggest he treated them any

differently than the other funds at issue.


     e.     **The Initial $110,000 Inheritance**

Kinsella inherited money from his mother, and, at some point, Kinsella turned over

approximately $110,000 of this inheritance to Todisco.  (Transcript, vol. 3, p. 7)  Kinsella testified to the

$110,000 figure, and although his memory does not appear to be reliable on many financial details, the

figure of $110,000 is corroborated by evidence that Todisco paid $1100 per month to Kinsella during at

least a portion of the period after this initial investment and before the further investment in 2003 of

the proceeds from the sale of his mother's house.  A monthly payment of $1100, when annualized,

represented an even 12% interest on principal of $110,000.  The precise date on which the $110,000

investment was turned over to Todisco is not established:  Kinsella conceded that it may have been as

late as 2001, and his own attorney, in a 2005 letter to Todisco, stated the arrangement commenced in

September of 2000.  Certainly the transfer occurred before September 17, 2001, the date of the first

$1100 check in evidence from Todisco to Kinsella.[9]


f.       **The Sale and Proceeds of the Methuen House**

In January 2003, around the time Kinsella purchased a home in Florida, Kinsella decided to sell

the house he had inherited from his mother, in Methuen, Massachusetts.  Kinsella asked and authorized

Todisco to undertake the cleaning and preparation of the house for marketing and then the marketing

and sale of the Methuen house.  To that end, Kinsella gave Todisco a special power of attorney to handle

all the transactions involved in selling the home.

Kinsella again retained Surette, this time to prepare the special power of attorney for the limited

purpose of enabling Todisco to handle for Kinsella the transactions necessary to effect a sale of the

house in Methuen.[10]  Surette again drafted the necessary document, and on January 26, 2003, Kinsella

signed the document at Surette's office.  Surette, who notarized Kinsella's execution of both powers of

attorney, testified that Kinsella's execution of both was free, willing, and voluntary, and I find

accordingly.  Surette understood that Todisco would receive and manage the net proceeds from sale of

the Methuen house for Kinsella.  The basis of this understanding is not in evidence, and Surette testified

that he was not privy to the specifics.

Todisco did oversee the marketing and sale of the Methuen house.  He also prepared the house

for sale, had it cleaned, and oversaw the removal and disposition of its contents.  He expended

approximately $3,000 of Kinsella's funds to make this happen but received none of the funds himself.[11]

---

[9] The checking records in evidence are partial and very incomplete.  I do not find that no $1100 payment was made before September 2001, only that Todisco had begun making such payments at least that early.

[10] It is unclear why a special power of attorney was necessary where Todisco already had a general power of attorney.  The general power had not been revoked.

[11] Transcript, vol. 1, pp. 130-131.  As part of the expended $3000, Todisco paid his sister and her husband $500 each for their effort in cleaning out the house.  Kinsella suggests that this amount was both excessive and unauthorized, but he has adduced no proof of either charge.  Kinsella's specific authorization was not needed

In March of 2003, Kinsella's Methuen home sold for $260,000 and yielded net proceeds of $251,142.98.  (Transcript, vol. 1, p. 143)  Attorney Surette, who handled the closing for Kinsella, mailed the check for the proceeds to Kinsella care of Todisco.  On March 21, 2003, Todisco, at Kinsella's direction, deposited these proceeds into their joint checking account.  (Transcript, vol. 1, pp. 124-25)

On March 25, 2003, Todisco made out two checks from this account in the total amount of $255,000 and "commingled these funds with his personal funds."  (Transcript, vol. 1, p. 127)  By this he meant simply that he put the money into his own personal account.  (Transcript, vol. 2, p. 176)   He testified that he did this at Kinsella's direction.  He further testified, credibly, that he used these funds and his own to pay Kinsella's bills every month.  (Transcript, vol. 1, p. 127)

### g.    Loss of the Funds; Evidence and Records of their Disposition

In April 2005, Todisco phoned Kinsella and, according to Kinsella's testimony, told him, "I made a bad investment, your money's gone."  (Transcript, vol. 2, pp. 232-233; vol. 3, p. 20)  Kinsella continued: "And I asked him, 'Have you been investing with hedge funds?'  He said, 'Yes.'"   In his own testimony, Todisco reiterated that he had in fact lost the money, as he had told Kinsella in that phone call, and that he lost it by trading in different types of securities from his own account.   (Transcript, vol. 1, p. 87; vol. 2, pp. 136-137)  He denied that he had spent it.  He testified that in 2003 and 2004, he lost a total of $421,000, with $359,000 of this loss occurring in 2003; his tax returns for the years in question reflected these losses.

No documentary evidence has been adduced by either party to trace the disposition of the monies that Todisco received from Kinsella and thereby verify or disprove his testimony that they were

---

because Kinsella had authorized Todisco to oversee and carry out the project, to make all the relevant decisions, and through both the joint account and the general and specific powers of attorney, to make the necessary payments.  The amounts of the payments do not appear on their face to have been excessive.

lost in bad investments.[12]  Kinsella maintains that, when he and his attorney asked Todisco for records

by which he could account for the funds, he told them that he had destroyed the records.  Todisco

testified that he neither destroyed any records nor said that he had destroyed records.  Rather, he

explained that it was not his practice to keep such paper records as he received when the same records

were maintained electronically and accessible on line.  He contends that he did not destroy the records

themselves; he merely discarded paper copies of certain electronic records.

Kinsella disputes this testimony and urges the court to find both that Todisco destroyed records

and, by inference from the destruction, that he did not lose the funds in bad investments but simply

misappropriated them.  The case for these findings is weak.  Kinsella adduced no evidence of the nature

and extent of the records that he contends Todisco received or maintained and then destroyed.  He

asked no questions of Todisco as to what precisely he did with the received monies.  What investments

had he made?  Could Kinsella's funds be traced into specific investments?  He did not ask Todisco to

explain when and how the monies had been moved into investments.  It is entirely plausible that

electronic records do exist of Todisco's entire trading history and of the movement of monies from bank

accounts to brokerage accounts.  These records could have been subpoenaed from the relevant

brokerages and financial institutions, but Kinsella neither appears to have subpoenaed records nor even

elicited from Todisco testimony identifying the relevant institutions and account numbers.

On this record, the Court cannot find that Kinsella has carried his burden of proof as to the

charge of misappropriation.  First, where Kinsella had made a gift of the funds to Todisco, the funds

were his to use as he saw fit; misappropriation is a non sequitur.  As importantly, notwithstanding the

loss of the funds, Todisco still very clearly viewed himself as responsible for funding Kinsella's annuity

and otherwise providing for him as a dependent.  I take this as evidence that he was at all relevant times

---

[12] Those records would be available by subpoena or otherwise from the financial institutions through which
Todisco did his banking and investing, but Kinsella has not adduced them and appears not even to have
subpoenaed them.

highly motivated to honor this obligation.  Todisco had no motive to use the funds in a manner that

would undercut his ability to support Kinsella.  It is probable that he invested the funds imprudently, in

unduly risky investments, and lost them as a result of these investments.

      h.      **Meeting, Litigation, and Bankruptcies**

After Kinsella learned from Todisco that the funds had been lost, he retained attorney Thomas

Barbar to assist him in determining what happened to them and obtaining redress for their loss.

Through a letter written on his behalf by Barbar and sent to Todisco on September 2, 2005, Kinsella

requested a full accounting, including all related banking and investment records, instructed Todisco to

cease and desist from any activity relating to Kinsella and the funds, and instructed him to have no

further contact or communication with Kinsella, either directly or through others.  (Transcript, vol. 1, pp.

51, 58)  In response to this "cease and desist letter," as the parties refer to it, Todisco retained counsel

of his own, attorney Leonard Henson, who, by letter of September 8, 2005, responded to Barbar's letter.

Henson's letter to Barbar informed him that Kinsella's credit card debt, which Todisco had been

managing until his receipt of the cease and desist letter, totaled approximately $131,000 and that

payments on these credit card accounts needed to be made timely in order to take advantage of

favorable, promotional rates of interest and to avoid the reversion of these cards to much higher rates,

in some cases as high as 29.99%, which, the letter continued, would be financially disastrous for Kinsella.

Through the letter, Todisco further offered to (1) continue to deposit $3,500 per month into the joint

checking account until December 31, 2005, and (2) from the joint account, pay the credit card debt

himself for the next 21 days, as he had previously done, in order to afford Kinsella time to either assume

control of the credit card accounts himself or to appoint another person to handle the paying of these

bills.

On September 27, 2005, Kinsella, Todisco, Barbar, and Henson had a four-way meeting at Barbar's office to discuss Kinsella's missing funds and what to do to stabilize the situation and meet immediate needs. (Transcript, vol. 1, p. 46)  At the meeting, Todisco turned over 12 credit cards for accounts belonging to Kinsella, the payment of which he had been handling for Kinsella.  He also produced a spreadsheet that identified the various cards and, for each, the account number and balance, the applicable promotional rate, the "fixed rate" to which the account would revert on expiration of the promotional rate, the date of the last payment, the credit limit and available credit, the minimum payment, and the account access username and password.  He also delivered to Kinsella a check in the amount of $1,724.75, representing the funds remaining under his control in the joint checking account.  Also, at this meeting it was agreed that Todisco would make payments to Kinsella of $3,500 per month through December, 2005, and Todisco did make such payments for the months of October, November, and December, 2005.  At this meeting, Todisco produced no other accounting.  He explained that he had not kept or maintained paper or hard-copy records of information that he had had access to electronically.  In a follow-up letter to Barbar dated December 2, 2005, Henson reiterated this and further noted that upon receipt of the cease and desist letter, Todisco's electronic access to Kinsella's credit and banking accounts was effectively terminated, so that, while Kinsella could retrieve the records, Todisco no longer could.

At or around the time that Todisco received the cease and desist letter, his relationship with Kinsella, which until then had been close and trusting, abruptly ended.  Its news—that Kinsella was now accusing Todisco of theft and misappropriation and treating him as a legal adversary—surprised and greatly upset Todisco.  When Kinsella arrived at Todisco's home in late August 2005 to retrieve belongings that Todisco had been storing for him, Todisco was visibly angry with him.  He later left a message on Todisco's cell phone in which he apologized for his anger and explained that he was upset that his best friend would no longer speak to him.  The call included no apology for Todisco's loss of the

funds.  From the content of this message, Todisco's demeanor in the message and in his testimony at trial, and the lack of evidence to the contrary, I find that Todisco does not appear to believe himself to have wronged Kinsella by the manner in which he handled the funds in issue.

On August 15, 2007, Todisco and his wife filed a petition for relief under Chapter 7.  In 2007 but before Todisco's bankruptcy filing, Kinsella filed suit against Todisco in Massachusetts Superior Court. Neither the complaint nor its substance is in evidence.  The action had not progressed beyond the pleading stage when Todisco filed his bankruptcy petition, which stayed the action.

Beyond the fact of Todisco's bankruptcy filing in 2007, very little evidence was submitted of Todisco's own financial situation during the years 2000 through 2007.  Todisco himself testified that in 2000 and 2001, he was making half a million dollars a year and "doing very well with my business." (Transcript, vol. 2, pp. 156-157)  It is clear as well that, in the years that he lost the money he'd been given by Todisco, 2003 and 2004, he lost other monies as well, funds of his own that had not originally been Kinsella's.  Aside from this, there is no evidence of Todisco's and his family's earnings, assets, investments, liabilities, income needs, spending habits.  Nor was evidence submitted of the circumstances that necessitated Todisco's bankruptcy filing.  Not even his bankruptcy schedules were introduced into evidence.  As a result, the Court cannot indulge an assumption on which Kinsella implicitly relies:  that Todisco was financially motivated to appropriate Todisco's assets as his own.  This would be speculation.

At some point after 2005, Kinsella, too, facing overwhelming credit card obligations and insufficient income and assets to service the same and his other obligations, filed a petition for bankruptcy relief.

i.    <u>**Management of Credit Cards and Bills**</u>

At some point, Todisco, at Kinsella's request, assumed responsibility for paying Kinsella's various

bills, including especially the monthly service on his various credit card accounts, but also his utilities

and other obligations.  The precise date of Todisco's assumption of these duties is not in evidence.  It

almost certainly did not start before September, 2000. The evidence shows that Todisco did handle the

payment of Kinsella's credit card and other bills from the date of assumption through September, 2005.

He did so with the monthly annuity payments he paid Kinsella, which he called "gifts back" to Kinsella.

Virtually no evidence was submitted of the activity on Kinsella's various accounts during this period.

Neither party submitted the statements on these accounts or other evidence of Kinsella's charges to the

accounts, their finance charges and rates, and the payments.  Kinsella does not contend that any of his

accounts ever fell into default during this period, and therefore I conclude that Todisco consistently and

timely paid at least the minimum amount due on Kinsella's debts during the period.

During this period, Kinsella's credit card debt nonetheless grew from an initial total of

approximately $90,000 to a total in September 2005 of $130,000.  The source of this growth is

unexplained, except that it obviously represents the difference between (i) new charges to the accounts

plus finance charges on existing balances and (ii) payments made on the accounts.  Kinsella alleges that

the growth is a product of Todisco's mismanagement of Kinsella's funds, but that allegation is not

supported by the evidence.  Todisco urged Kinsella to use the funds to pay off the credit card debt in

full, but Kinsella responded that he didn't want to use the funds in that way and preferred instead to

preserve the principal for Todisco and his family.  The consequence of this choice, Kinsella's own, was to

continue incurring crippling levels of finance charges.

Todisco testified that, for at least a portion of the time that he handled the payment of Kinsella's

bills, he systematically took advantage of promotional rates offered by the various credit card lenders,

paying balances on high rate cards by transferring those balances to cards with no interest or low

interest rates.  This effort, as evidenced by his testimony and the spreadsheet he adduced at the four-way meeting in September 2005, was labor-intensive, required scrupulous attention to payment deadlines, and resulted in large savings to Kinsella.  As of September 2005, 8 of 12 credit card accounts were benefitting from promotional rates of 5, 6, and 10 percent; the rates on these cards would otherwise have been between 16 and 29 percent.  It is not clear when and for how long Todisco managed Kinsella's accounts in this way.

It is worth noting that for at least the first two years of Todisco's payment of Kinsella's bills, the monthly annuity was $1,100, but interest at an optimistic average interest rate of 15% on a principal balance of $90,000 would have consumed $1125 per month.  Therefore, although Todisco apparently managed to keep these accounts out of default, he simply did not have the funds at his disposal (at least without recourse to the principal) to prevent this debt from growing, even without new charges against the accounts.

In addition, the credit cards were not Kinsella's only monthly obligations.  Before sale of his mother's house in 2003, he had to pay the taxes and utilities on it.  In 2003, he purchased a relatively inexpensive home and, against Todisco's advice, financed the purchase.  Later he purchased an automobile on credit, too.  These resulted in monthly obligations for his car and his house.  He had also the usual expenses for utilities, gas, and food.  To fund these obligations he had income from only two sources:  a modest pension of approximately $11,600 per year and the annuity from Todisco.


**DISCUSSION**

Kinsella seeks a determination that his unliquidated tort claims against Todisco for misappropriation of the allegedly-entrusted funds are excepted from discharge on five separate legal bases:  (i) as a debt for fraud while acting in a fiduciary capacity, 11 U.S.C. § 523(a)(4); (ii) as a debt for defalcation while acting in a fiduciary capacity, § 523(a)(4); (iii) as a debt for embezzlement, § 523(a)(4);

20

(iv) as a debt for larceny, § 523(a)(4); and (v) as a debt for willful and malicious injury to his property, §

523(a)(6).  In each instance, the gravamen of the cause of action is that the funds at issue remained at all

times Kinsella's, and Todisco converted or misappropriated them as his own, violating or exceeding the

scope of his authorization and entrustment.  None of the five grounds is based on an allegation that

Todisco invested the funds for Kinsella in a manner that was negligent, or reckless, or inconsistent with a

fiduciary obligation, or that Todisco gave bad advice by representing that a 12% annual return was

feasible or prudent for a retiree to attempt.  The charge in each instance is outright theft.  As both

parties recognize, the case stands or falls on that issue.

Kinsella bears the burden of proving that the debt is excepted from discharge.  *Century 21*

*Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir. 1994) ("claimant must show that its

claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)").  The standard of

proof is a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 285, 111 S.Ct. 654, 659

(1991).


   a.      **Fraud while Acting in a Fiduciary Capacity**

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt "for fraud while

acting in a fiduciary capacity."  11 U.S.C. § 523(a)(4).  This exception requires a showing that the debtor

acted in a fiduciary capacity, that he committed fraud, and that he committed the fraud while acting in

the fiduciary capacity.  *Rutanen v. Baylis (In re Baylis),* 313 F.3d 9, 17 (1st Cir. 2002) (the fiduciary

capacity exceptions in § 523(a)(4) require a showing not just that the debtor was a fiduciary but also

that the debtor committed the fraud or defalcation *while acting in* that capacity).  Kinsella contends that

the requisite fiduciary capacity is supplied by the fact that Todisco was acting under a power of attorney

for Kinsella.  And Kinsella further contends that Todisco committed fraud in that fiduciary capacity by

misrepresenting to Kinsella that, if Kinsella entrusted the funds to him, he would hold those funds for

Kinsella and invest them for his benefit; and this representation was false, Kinsella continues, because

Todisco instead used the funds as his own.[13] (Transcript, vol. 3, pp. 93-94)

Without deciding the issue, I will accept for the sake of argument that when exercising a power

of attorney for Kinsella, Todisco exercised that power as a fiduciary for Kinsella.[14] Even if that is the

case, this count fails to state a claim on which relief can be granted because Todisco does not allege

that, in making the allegedly false representation, Todisco was acting on Kinsella's behalf with a third

party. That is, the alleged fraud is not a fraud committed in the exercise of the power of attorney. The

alleged representations were made by Todisco to Kinsella. As this count is articulated by Kinsella, the

alleged fraud was not committed "while acting in" a fiduciary capacity.

When one moves from the validity of the theory to the proof of its elements, Kinsella's case

falters for at least two additional reasons. First, Kinsella has not proven by a preponderance of the

evidence that Todisco represented to Kinsella that he would hold the funds in Kinsella's name. Rather,

the evidence suggests that Kinsella gave the funds to Todisco as a gift. But gift or no gift, Kinsella has

not sustained his burden of showing that he and Todisco had a specific understanding as to the manner

in which Todisco was to hold the funds and generate Kinsella's annuity, or that Todisco made any

representation in that regard. Second, although Todisco admittedly placed the funds in his own name

and invested them through his own investment account, Kinsella has not proven by a preponderance of

the evidence that the funds, as held and invested by Todisco, ever (a) ceased being identifiable as

Kinsella's or (b) were used by Todisco in a manner that was inconsistent with the manner he should

have used them had they held them in Kinsella's name for Kinsella's benefit. In short, Kinsella has not

proven that Todisco made the alleged representation or that, if he made it, he made it without intent to

---

[13] It is not clear whether Kinsella is alleging that the representation was false when made because Todisco intended *when he made the representation* to use the funds as his own, or simply that Todisco later acted inconsistently with his promise. The former would be fraud but the latter would not, at least not in the making of the statement. Because I find that this count fails on numerous other grounds, the ambiguity is inconsequential.
[14] Although I accept that proposition for these purposes, I have significant doubt that one holding a power of attorney is for that reason a fiduciary.

honor it.  Moreover, Kinsella has not proven that his assets were improperly invested, only that they were lost.  For these reasons, Kinsella has neither properly pleaded nor proven fraud while acting in a fiduciary capacity.

**b.    <u>Defalcation while Acting in a Fiduciary Capacity</u>**

Section 523(a)(4) also excepts from discharge a debt for defalcation while acting in a fiduciary capacity.  As with fraud while acting in a fiduciary capacity, a creditor must prove three elements:  (1) a fiduciary capacity, (2) a defalcation, and (3) that the defalcation was committed "while acting in" the fiduciary capacity.  Kinsella again contends that a fiduciary relationship was supplied by the fact that Kinsella had given Todisco a power of attorney.  The defalcation, Kinsella continues, is supplied by Todisco's having appropriated the funds as his own.

Again, without deciding the issue, I will accept for the sake of argument that when exercising a power of attorney for Kinsella, Todisco exercised that power as a fiduciary for Kinsella.  Even if that is the case, this count fails for the following reasons.  First, there is no evidence that in any of the acts of which Kinsella complains, Todisco was using or acting under the power of attorney.  The acts in question, to the extent that Kinsella has identified them at all, were the acts by which Todisco simply received funds from Kinsella and deposited them into his own bank or investment accounts.[15]  Nothing in these acts constitutes a use of a power of attorney.  The acts were not committed while acting in a fiduciary capacity.

Second, the evidence preponderates in favor of a finding that Kinsella gave the funds to Todisco as a gift.  They were his, not Kinsella's, and therefore there can have been no breach of a trust as to the funds.

---

[15] Kinsella identifies no other acts that constitute defalcations.

Third, regardless of whether the funds were a gift, Kinsella has not demonstrated by a preponderance of the evidence that Todisco actually used them in a manner inconsistent with the alleged entrustment.  Todisco did in fact transfer the monies into his own bank or investment accounts, but this was not inconsistent with what Kinsella contemplated.  He wanted Todisco and his family to have the funds and their benefit; and though he cared about his annuity, he left to Todisco the question of how to generate it.  Moreover, beyond the fact that Todisco placed the funds in his own accounts, there is no evidence that, within Todisco's bank and investment accounts, the funds received from Kinsella ever ceased to be identifiable as such or that Todisco used or managed them in any way at odds with Kinsella's interests, desires, and purposes.   For these reasons, there was no defalcation while acting in a fiduciary capacity.

c.   <u>**Embezzlement**</u>

Section 523(a)(4) excepts from discharge debts for embezzlement.  Embezzlement is "the fraudulent conversion of the property of another by one who is already in lawful possession of it."   *In re Sherman*, 603 F.3d 11, 13 (1st Cir. 2010) (defining embezzlement as used in § 523(a)(4)).  It thus requires proof that the property in question belonged to another and that it was appropriated by the perpetrator in a manner inconsistent with the property rights of the other and the scope of his or her authorization to deal with the property.  In addition, "to amount to embezzlement, conversion must be committed by a perpetrator with fraudulent intent. . . .  It is knowledge that the use is devoid of authorization, scienter for short . . . that makes the conversion fraudulent and thus embezzlement."  *Id*.

Embezzlement has not been proven here for the following reasons.  First, the evidence preponderates in favor of a finding that Kinsella gave the funds to Todisco as a gift.  They were his, not Kinsella's.  Second, regardless of whether the funds were a gift, Kinsella has not demonstrated by a preponderance of the evidence that Todisco actually used the funds in a manner inconsistent with that

which Kinsella authorized and contemplated.  And third, Kinsella has not carried his burden on the issue

of fraudulent intent, knowledge by Todisco that his actions were devoid of authorization.  In short, the

evidence does not support a conclusion of embezzlement.

    **d.**    <u>**Larceny**</u>

Section 523(a)(4) excepts from discharge debts for larceny.  Larceny is distinguishable from

embezzlement in that, in larceny, the perpetrator's acquisition of the property is unlawful.  *Farley v.*

*Romano (In re Romano),* 353 B.R. 738, 765 n.10 (Bankr. D. Mass. 2006).  Despite his count for

nondischargeability on the basis of larceny, Kinsella does not even contend that funds came into

Todisco's possession unlawfully.  Therefore, whatever may have happened here, it was not larceny.

    **e.**    <u>**Willful and Malicious Injury**</u>

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor

to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).   Judge Somma

summarized the requirements of this exception:

> The Plaintiff must show that the Debtor injured her or her property
> and that the injury was both "willful" and "malicious."
> "Willfulness" requires a showing of intent to injure or at least of
> intent to do an act which the debtor is substantially certain will
> lead to the injury in question.  *Kawaauhau v. Geiger*, 523 U.S. 57,
> 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).  "Malicious" requires the
> injury to have been "wrongful," "without just cause or excuse,"
> and "committed in conscious disregard of one's duties."  *Printy v.*
> *Dean Witter Reynolds, Inc.*, 110 F.3d 853, 859 (1st Cir.1997).
> Malice thus has both objective and subjective elements:  the injury
> must have been objectively wrongful or lacking in just cause or
> excuse; and the debtor must have inflicted the injury in "conscious
> disregard" of her duties, meaning that she has to have been *aware*
> that the act was wrongful or lacking in just cause or excuse.

*Burke v. Neronha (In re Neronha)*, 344 B.R. 229, 231-32 (Bankr. D. Mass. 2006).

Here, as in the count for embezzlement, the gravamen of this count is Kinsella's charge that

Todisco converted the funds, appropriated them as his own, in a manner inconsistent with the purpose

of the alleged entrustment.  This count fails for the same reasons the embezzlement count failed.  First,

the evidence preponderates in favor of a finding that Kinsella gave the funds to Todisco as a gift.  They

were his, not Kinsella's.  Second, regardless of whether the funds were a gift, Kinsella has not

demonstrated by a preponderance of the evidence that Todisco actually used the funds in a manner

inconsistent with Kinsella's authorization.  And third, Kinsella has not carried his burden on the issues of

intent to injure and knowledge by Todisco that his actions were devoid of authorization and thus

wrongful.  Kinsella has therefore not carried his burden of proof as to his count under § 523(a)(6).


**CONCLUSION**

For these reasons, Kinsella has not established a basis for exception of his claims against Todisco

from discharge.  A separate judgment will enter declaring that any liability Todisco may have to Kinsella

is discharged.


Date:  July 15, 2011

Frank J. Bailey
United States Bankruptcy Judge